**FEDERAL DEPOSIT INSURANCE COR-PORATION, in its Corporate Capacity as Liquidator of First State Bank Pflugerville, Plaintiff–Appellee,**

v.

**Jerry S. PAYNE, Defendant–Appellant.**

No. 91–8422.

United States Court of Appeals,
Fifth Circuit.

Sept. 25, 1992.

Robert C. Shaddox, Payne & Associates, Houston, Tex., for defendant-appellant.

Gregory E. Gore, Counsel, William E. Minkley, F.D.I.C., Washington, D.C., for plaintiff-appellee.

Before JONES and WIENER, Circuit Judges, and LITTLE, District Judge.*

WIENER, Circuit Judge:

Defendant–Appellant Jerry S. Payne, a lawyer proceeding pro se as the guarantor of a promissory note, appeals the district court's grant of summary judgment in favor of Defendant–Appellee the Federal Deposit Insurance Corporation (FDIC). That summary judgment was granted on the grounds that Payne's defense of fraud in the inducement is barred by the *D'Oench, Duhme* doctrine and that his defenses of lack of notice of the sale of collateral and failure to dispose of collateral in a commercially reasonable manner are barred by the federal holder in due course doctrine. Agreeing that Payne's fraudulent inducement defense is thus barred but finding that the federal holder in due course doctrine does not apply to bar Payne's defenses on his guaranty and that the district court erred in holding that Payne had waived notice of the sale of collateral and was not entitled to rely on the FDIC's failure to plead commercial reasonableness, we reverse and render summary judgment in favor of Payne.

## I.

### FACTS AND PROCEEDINGS

In October 1986, First State Bank Pflugerville (the Bank) owned a note executed by Payne & Potter, Inc. in the amount of $300,000 (the corporate note). Payne & Potter, Inc. was a Texas corporation that had ceased doing business and had few assets. Payne, owner of less than a majority of stock in the corporation, had signed the corporate note on behalf of Payne & Potter, Inc., but had no personal liability on that debt.

When the corporate note fell into default, Payne and the Bank attempted to find a buyer for the real property that was encumbered to secure the corporate note. On October 10, 1986, Larry Tarrington purchased the real property for the benefit of Dr. William Bryce. On that day, Dr. Bryce executed a promissory note in the principal amount of $382,500 (the Bryce note), payable to the Bank. The Bryce note was secured by (1) a vendor's lien on the same real property; (2) a $20,000 certificate of deposit drawn on the Bank in the name of Payne and Potter, Inc.; and (3) a security interest in a 9.25 carat diamond ring. Also on that day, Payne executed a personal guaranty for payment of $342,000 of the Bryce note.

In December of 1987, after Dr. Bryce had defaulted on the Bryce note, the Bank sold the diamond ring to pay property taxes on the real estate. Payne received no prior notice of that sale. In January 1988, Dr. Bryce and the Bank entered into a modification agreement, but Dr. Bryce again failed to make payments on the note. The Bank brought suit against Dr. Bryce and Payne in Texas state court, after which that court granted a default judgment against Dr. Bryce. Subsequently, the Bank's board of directors closed the Bank, and the State Banking Commissioner declared the Bank insolvent and appointed the FDIC as receiver. After the assets of the Bank were purchased by the FDIC in its corporate capacity, it removed the litigation to federal district court.

Both Payne and the FDIC moved separately for summary judgment. Payne's motion for summary judgment asserted several defenses to his liability under the guaranty. On March 21, 1991, the district court entered a final judgment granting

---

* District Judge of the Western District of Louisiana, sitting by designation.

the FDIC's motion and denying Payne's. On April 4, 1991, Payne filed a motion for new trial and his second motion for summary judgment. The district court denied those on May 28, 1991. On June 28, 1991, Payne filed a second motion for new trial and a third for summary judgment. The district court denied those on July 3, 1991. Payne filed a third motion for new trial and his fourth for summary judgment on July 22, 1991. The district court denied those motions and imposed sanctions against Payne. He filed notices of appeal from the district court's final judgment, the orders denying his three motions for new trial and four for summary judgment, and the order imposing sanctions.

## II.

## ANALYSIS

A. *The D'Oench, Duhme Doctrine and 12 U.S.C. § 1823(e).*

■ Payne contends that the Bank fraudulently induced him into executing the guaranty for the Bryce note. Before executing the guaranty, Payne informed the president of the Bank that he was suspicious of Tarrington, Dr. Bryce's agent. The president agreed to investigate Dr. Bryce's financial condition. Payne asserts that the Bank's loan committee subsequently informed him that the Bank had investigated Dr. Bryce and had determined that he was a qualified buyer in good financial condition. The Bank's investigation actually revealed that Dr. Bryce was (1) under investigation by California medical authorities, (2) insolvent, and (3) not a qualified buyer of the real estate. Payne contends that he executed the guaranty in reliance on the Bank's false representations. Approximately one month after Payne executed the guaranty, he discovered that the information on which he had relied was false, and demanded the return of his guaranty—but to no avail.

The district court held that Payne's defense of fraudulent inducement was precluded by the *D'Oench, Duhme* doctrine

and 12 U.S.C. § 1823(e). The *D'Oench, Duhme* doctrine is a common law rule of estoppel that precludes a borrower from asserting against the FDIC defenses based on secret or unrecorded "agreements" that alter the terms of the obligation.[1] The codification of that doctrine in FIRREA, 12 U.S.C. § 1823(e), provides:

No agreement which tends to defeat the interest of the [FDIC] in any asset acquired by it under this section ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously, from the time of its execution, an official record of the depository institution.

In *Langley v. Federal Deposit Ins. Corp.*,[2] the makers of a promissory note and personal guaranties proffered misrepresentation by the lender as a defense to the FDIC's claim for payment of the note. The makers asserted that the lender had procured the notes by misrepresentations regarding property conveyed in a related land purchase. The makers argued that "agreement" for purposes of Section 1823(e) encompassed only an express promise to perform an act in the future, and did not encompass the kinds of material terms or warranties of the lender relied on by the makers in their affirmative defenses. The Supreme Court rejected that argument, finding that the truthfulness of the lender's warranties was a condition to performance of the makers' obligation to repay the loan, and thus constituted a main component of an "agreement" for purposes of

---

1. *Campbell Leasing, Inc. v. Federal Deposit Ins. Corp.,* 901 F.2d 1244, 1248 (5th Cir.1990).

2. 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).

Section 1823(e).[3] The Court held that as the representations alleged by the makers did not meet the writing, approval, and filing requirements of Section 1823(e), the makers could not assert misrepresentation as a defense.[4]

Although *Langley* involved the applicability of Section 1823(e) to the maker of a promissory note, Section 1823(e) is equally applicable to the maker of a guaranty. In *Federal Deposit Ins. Corp. v. Cardinal Oil Well Servicing Co.*,[5] the guarantors asserted that bank officials had misrepresented that the guaranty commitments would apply only to a single transaction involving the interim financing of oil field servicing equipment and would not extend to the promissory note that was the subject of the lawsuit. We held that Section 1823(e) barred the guarantors from asserting that defense against the FDIC. We reasoned that, as the guarantors were attempting to assert an oral side agreement by the bank not to enforce the guaranty agreements according to their express terms, that non-written agreement could not meet the requirements of Section 1823(e).[6]

The Tenth Circuit case of *Federal Deposit Ins. Corp. v. Galloway*[7] is even more directly on point. In that case, before executing guaranty agreements, the guarantors asked the bank's president if the maker of the promissory note was a good credit risk. The bank president orally assured the guarantors that the maker had paid an earlier note, knowing that the maker had not done so. The maker subsequently defaulted, and the FDIC brought suit against the maker and the guarantors. The guarantors asserted fraud in the inducement as a defense to their liability. The Tenth Circuit held that the reasoning behind *Langley*'s holding applied equally to guarantors, and that Section 1823(e) prevented the

guarantors from raising fraud in the inducement as a defense against the FDIC.[8]

 Section 1823(e) bars Payne from asserting the Bank board's fraudulent inducement as an affirmative defense to the FDIC's suit on Payne's guaranty agreement. Payne argues, however, that he falls under an exception to Section 1823(e) and the *D'Oench, Duhme* doctrine, known as the "wholly innocent borrower" rule. He relies on *Federal Deposit Ins. Corp. v. Meo*,[9] a 1974 Ninth Circuit case. In that case, Meo executed a promissory note to acquire shares of the lender bank's common stock. The bank improperly directed its brokers to issue and transmit voting trust certificates in Meo's name instead of common stock. Meo's note remained an asset of the bank until it was closed and the FDIC assumed control of its assets. The FDIC filed suit against Meo when he refused to pay the note. Meo did not learn of the bank's improper handling of his common stock order until after the FDIC filed suit. Meo asserted failure of consideration as a defense. The Ninth Circuit held that *D'Oench, Duhme* did not apply to bar Meo's defense because (1) Meo was a bona fide purchaser-borrower; (2) he did not enter into any scheme or secret agreement whereby the assets of the bank would be overstated; (3) he was innocent of the wrongful action of the bank; (4) he was not negligent in failing to discover the bank's wrongdoing; and (5) he had no knowledge of the failure of consideration until after the FDIC brought suit.[10]

Payne argues to us that he was a "wholly innocent borrower" because he (1) was not part of the fraudulent scheme by the Bank; (2) was not negligent; and (3) demanded the return of the guaranty contract when he learned of the Bank's misrepresentations. The district court rejected Payne's argument, noting that Payne

---

**3.** *Id.* at 91, 108 S.Ct. at 400–02, 98 L.Ed.2d at 346–47.

**4.** *Id.* at 96, 108 S.Ct. at 403, 98 L.Ed.2d at 350.

**5.** 837 F.2d 1369 (5th Cir.1988).

**6.** *Id.* at 1372.

**7.** 856 F.2d 112 (10th Cir.1988).

**8.** *Id.* at 114–15.

**9.** 505 F.2d 790 (9th Cir.1974).

**10.** *Id.* at 792.

had testified in an affidavit that he investigated the financial background of Larry Tarrington, Bryce's agent, and believed that Tarrington was a "con-artist" before executing the guaranty. The district court concluded that the results of Payne's own investigation precludes his being "wholly innocent."

We need not consider Payne's innocence. Even if Payne's reliance on *Meo* might have been well placed at one time, it is misplaced today and has been since *Langley* was decided in 1987. In *Langley*, the makers of the note were "wholly innocent" in that they relied on false representations by the bank in executing the note. Yet the Supreme Court held that the makers could not assert their defense. In so doing the *Langley* Court destroyed the "wholly innocent borrower" exception to the *D'Oench, Duhme* doctrine. Irrespective of the basis of its decision, the district court's holding that Payne could not assert fraudulent inducement as a defense, even under the former "wholly innocent borrower" exception, is not reversible error.

### B. *Federal Holder in Due Course Doctrine.*

 The district court, after holding that the *D'Oench, Duhme* doctrine and Section 1823(e) barred Payne's defenses, held that Payne's defenses were "equally forestalled" by the federal holder in due course doctrine. The district court relied on *Federal Sav. and Loan Ins. Corp. v. Murray*[11] and *Campbell Leasing, Inc. v. Federal Deposit Ins. Corp.*[12] In *Murray*, the FSLIC acquired a promissory note through a purchase and assumption transaction after the lender institution became insolvent. We held that, although the FSLIC did not

11. 853 F.2d 1251 (5th Cir.1988).

12. 901 F.2d 1244 (5th Cir.1990).

13. *Murray,* 853 F.2d at 1256.

14. *Campbell Leasing,* 901 F.2d at 1249.

15. 923 F.2d 353 (5th Cir.1991).

16. Subsequent to *Montross,* the Texas Supreme Court in *Amberboy, et al. v. Societe de Banque*

meet the technical requirements of a holder in due course because it acquired the note through a purchase and assumption transaction rather than in the normal course of business, the FSLIC nonetheless had the status of a holder in due course as a matter of federal common law.[13]

In *Campbell Leasing,* the FDIC acquired a note through a bulk transaction which, under Texas law, prevents a holder from enjoying holder in due course status. We held that, as in *Murray,* the FDIC was a holder in due course under federal common law even though it did not meet the technical requirements of a holder in due course under state law.[14]

Relying on *Sunbelt Sav., FSB Dallas, Texas v. Montross,*[15] Payne argues that as his guaranty was not a negotiable instrument the FDIC could not be a holder in due course, even under federal common law. In *Montross,* a maker executed a variable interest promissory note (at that time, a non-negotiable instrument under Texas law)[16] in favor of Sunbelt Savings, but subsequently defaulted. After filing suit against the maker, Sunbelt Savings failed. The FDIC assumed control and established Sunbelt Savings FSB, which acquired the note among those assets of the failed thrift transferred by the FDIC. The district court granted summary judgment in favor of Sunbelt Savings FSB, holding that the federal holder in due course doctrine barred all of the maker's defenses. On appeal, we addressed whether the federal holder in due course doctrine protects the FDIC from personal defenses to the enforcement of non-negotiable instruments.

We distinguished *Murray* and *Campbell Leasing* by noting that *Murray*'s holding was expressly limited to negotiable instru-

*Privee, et al.,* 831 S.W.2d 793 (Tex.1992) held definitively that "a promissory note requiring interest to be charged at a rate that can be determined only by reference to a bank's published prime rate is a negotiable instrument as defined by the Texas Uniform Commercial Code." *Id.* at 797. Although *Amberboy* would change the specific result of *Montross,* it would not affect its interpretation that Texas law applies in determining negotiability and therefore controls the question of federal holder in due course and the availability of personal defenses.

ments acquired by purchase and assumption and that *Campbell Leasing* did not deal with negotiability at all.[17] We stated that the policy behind *Murray, Campbell Leasing,* and the *D'Oench, Duhme* doctrine—preventing the FDIC from being disadvantaged by "secret" oral or unrecorded agreements when it is forced to assume control of a troubled financial institution—does not apply to non-negotiable instruments.[18] We further stated that negotiability is the foundation underlying holder in due course status and that non-negotiable instruments are merely contractual obligations, which do not enjoy holder in due course protection.[19] We noted that the makers of non-negotiable instruments have no expectation that the holder in due course doctrine will apply to defeat their defenses. We thus held that the FDIC did not have holder in due course status with respect to non-negotiable instruments and that, "when the FDIC assumes control of an institution, the assets are what they are—negotiable instruments, contracts, real property, and so on."[20]

The FDIC relies on the Sixth Circuit case of *Federal Deposit Ins. Corp. v. Morrison*[21] in arguing that the non-negotiability of the guaranty does not prevent the FDIC from being a holder in due course. In *Morrison,* the Sixth Circuit held that the federal common law *D'Oench, Duhme* doctrine nullified the guarantors' defense that the lender bank had materially altered their guaranty because the guarantors had " 'lent' themselves to the execution of an instrument which resulted in misleading the FDIC in valuing the assets of the failed bank."[22] The guarantors argued that, because the guaranty did not qualify as a negotiable instrument, federal common law should not govern the rights of the FDIC. The Sixth Circuit rejected that argument, stating that:

[G]uaranties, by their nature, exist for the purpose of providing additional assurance that debts to which they relate are collectible.... Such guarantees enhance the value of the Bank's commercial paper and, as a result, any acts by the maker of a guaranty which are likely to deceive the FDIC as to the value of the assets it purchases are indistinguishable in effect from those of the makers of the Bank's negotiable instruments. Therefore, it is appropriate to apply the same policies to makers of guarantees in favor of a Bank as to makers of promissory notes.[23]

*Montross* resolves this issue in Payne's favor. We held that assets acquired by the FDIC by purchase and assumption retain the same characteristics in the hands of the FDIC as they had in the hands of the insolvent bank. Payne's guaranty was merely a contract between Payne and the Bank. The FDIC is no alchemist and thus has no philosopher's stone with which to transform Payne's non-negotiable contract of guaranty into a negotiable instrument. Consequently, the FDIC cannot have holder in due course status with respect to the guaranty and therefore is not immune to Payne's defenses.

## C. *Available defenses.*

### 1. *Right to receive notice of the sale of collateral*

■ Payne contends that he is not liable on the guaranty for any deficiency because the Bank disposed of the diamond ring that was being held as collateral for the Bryce note without giving Payne prior notice of the sale. The FDIC concedes that Payne received no prior notice, but relies on the express waiver of notice contained in the guaranty. The district court agreed, rejecting Payne's lack of notice argument because the guaranty expressly waived the

17. *Id.* at 356.

18. *Id.*

19. *Id.*

20. *Id.* at 357.

21. 816 F.2d 679 (6th Cir.1987) (table) (text in Westlaw).

22. *Id.* at page 4 of Westlaw text (1987 WL 37065).

23. *Id.* at page 5 of Westlaw text.

right to receive notice. The district court held the waiver to be effective.

Payne does not contest the existence of the waiver language in the guaranty; he argues instead that under Texas law he could not effectively waive his right to receive notice of the sale unless he executed the waiver after Dr. Bryce's default on the note. Payne insists that, as he executed the waiver before Dr. Bryce defaulted, and as he did not receive notice of the sale of the diamond ring, the FDIC cannot sue Payne for a deficiency.

Payne's argument has merit. TEX.BUS. & COM.CODE ANN. § 9.504(c) provides in part:

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, *reasonable notification* of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made *shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.*[24]

Texas courts have consistently held that the term "debtor" in Section 9.504 includes guarantors of secured transactions and that a guarantor may not waive his right to notice of sale or disposition of collateral prior to a default on the debt guaranteed.[25] Thus, under Texas law, Payne did not effectively waive his right to receive prior notice of the disposition of the diamond ring.

■ The FDIC argues that we should not follow TEX.BUS. & COM.CODE ANN. § 9.504(c) on this issue. Instead, the FDIC urges, we should follow the model Uniform Commercial Code (UCC) version of Section 9.504(c) and cases interpreting that statute.

The FDIC relies on *United States v. Unum, Inc.,*[26] in which we stated:

[W]e are not constrained to follow any modifications to the model UCC made by a forum state, nor are we bound by decisions of the forum state courts. We opt to follow the model UCC and those cases which best supplement the UCC and further its purposes and design.[27]

The FDIC has failed to demonstrate that this issue would be resolved differently under the model UCC than under Texas law. The language of Section 9–504(3) of the model UCC with regard to a debtor's right to receive notice of a sale of collateral is identical to the language of TEX.BUS. & COM.CODE ANN. § 9.504(c). Thus, only caselaw holding either that a guarantor is not a "debtor" for purposes of Section 9–504(3) of the model UCC or that a guarantor may waive his right to notice of the disposition of collateral prior to default could persuade us that Payne effectively waived his right to such notice when he signed the guaranty.

In attempting thus to persuade us, the FDIC cites *United States v. H & S Realty Co.*[28] for the proposition that a guarantor may waive his rights under Section 9–504(3). In that case, the First Circuit held that a guarantor effectively waived the requirement under Section 9–504(3) that every aspect of the disposition of collateral be commercially reasonable.[29] The instant case is easily distinguishable from *H & S Realty*, however, because that case did not involve a purported waiver of the right to receive prior notice of the sale of collateral. The court in *H & S Realty* noted that it was addressing an issue on which Section 9–504(3) is silent—the ability to waive the commercial reasonableness requirement. The model UCC version of Section 9–504(3) is not silent on the ability to waive the

**24.** TEX.BUS. & COM.CODE ANN. § 9.504(c) (West 1991) (emphasis added).

**25.** *Carroll v. General Electric Credit Corp.,* 734 S.W.2d 153, 154–55 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Hernandez v. Bexar County Nat'l Bank,* 710 S.W.2d 684, 687 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *Peck v. Mack Trucks, Inc.,* 704 S.W.2d 583, 585–86 (Tex. App.—Austin 1986, no writ).

**26.** 658 F.2d 300 (5th Cir.1981).

**27.** *Id.* at 304 n. 2.

**28.** 837 F.2d 1 (1st Cir.1987).

**29.** *Id.* at 3.

right to prior notice of the sale of collateral, however.

Both Section 9–504(3) of the model UCC and Tex.Bus. & Com.Code Ann. § 9.504(c) provide that a debtor shall receive notice "if he has not signed *after default* a statement renouncing or modifying his right to notification of sale." The FDIC cites no cases holding that a debtor may effectively waive his right to notice before default. In the absence of any contradictory authority, we apply Texas law and hold that, as Payne executed the waiver on which the FDIC relies before default, the district court erred in concluding that Payne effectively waived his right to receive prior notice of the disposal of the diamond ring. As Payne neither received the required notice nor effectively waived his right to receive such notice, the FDIC could not sue Payne for a deficiency on the Bryce note.[30] The district court erred, therefore, in granting the FDIC's motion for summary judgment and in denying Payne's motion on this issue.

### 2. *Pleading Requirements*

■ Payne also contends that the FDIC failed to plead or prove an essential element of its cause of action—that it sold the diamond ring in a commercially reasonable manner. Until recently, the question of who bears the burden of pleading commercial reasonableness or lack thereof was unsettled in Texas. The Texas Supreme Court settled that question in *Greathouse v. Charter Nat'l Bank–Southwest.*[31] In *Greathouse,* the supreme court held that:

> [A] creditor in a deficiency suit must plead that disposition of the collateral was commercially reasonable. This may be pleaded specifically or by averring generally that all conditions precedent have been performed or have occurred. If pleaded generally, the creditor is required to prove that the disposition of collateral was commercially reasonable only if the debtor specifically denies it in

his answer. Should the creditor plead specifically, then it must, of course, prove the allegation in order to obtain a favorable judgment.[32]

In the instant case, the FDIC neither specifically pleaded the commercial reasonableness of the disposition of the diamond ring nor generally pleaded that all requirements for the effective disposition of collateral had been met.

*Greathouse* and other Texas jurisprudence preceding it make clear that a creditor who has disposed of collateral and who cannot defeat a debtor's challenge to lack of notice or commercial reasonableness is barred from obtaining a deficiency judgment, not merely subject to reduction of the amount of the deficiency equal to the value of the collateral disposed of faultily. The court in *Greathouse* stated:

> A commercially reasonable disposition of collateral is in the nature of a condition to a creditor's recovery in a deficiency suit. We suggested this in *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769, 771 (Tex.1982), where we said: "The only limits on the creditor's disposition of the collateral is that it must be commercially reasonable, and must be made only after notification to the debtor if required by section 9.504. *Then and only then* is he entitled to sue for a deficiency."[33]

As the FDIC should not have been allowed to maintain its cause of action against Payne, the district court erred in rendering summary judgment for the FDIC and in refusing to render summary judgment in favor of Payne.

### III.

### CONCLUSION

The district court did not err in holding that Section 1823(e) barred Payne's defense of fraudulent inducement. The district court did err, however, in holding that the FDIC was a holder in due course of

---

**30.** *Carroll,* 734 S.W.2d at 155.

**31.** 1992 WL 148109, 35 Tex.Sup.Ct.J. 1017 (July 1992).

**32.** *Id.* at 1020.

**33.** *Id.*

Payne's guaranty under federal common law and thus was immune from all of Payne's personal defenses. As the guaranty was not a negotiable instrument, under *Montross* the FDIC could not have acquired holder in due course status with respect to that contract between Payne and the Bank. As the FDIC was not a holder in due course, Payne was entitled to assert his defense that he did not waive his right to receive notice of the sale of collateral, and the district court erred in granting summary judgment on that issue.

The district court also erred in holding that Payne waived his right to such notice and thus erred in granting summary judgment in favor of the FDIC on this issue as well as in denying Payne's summary judgment motion. It is well settled in Texas that a guarantor may not effectively waive his right to receive notice of the disposition of collateral before the obligation guaranteed is in default. In addition, as the FDIC failed to meet the requirement to plead commercial reasonableness, the district court erred in denying Payne's motion for summary judgment.

For the foregoing reasons, we RE-VERSE the judgment of the district court and RENDER summary judgment in favor of Payne, dismissing the FDIC's suit against Payne for a deficiency on the Bryce note.